IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NOLEN CHAMBERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 17-CV-279-SMY |
| | ) |
| KIMBERLY BUTLER, JOHN TROST, | ) |
| JACKIE STUEVE, FE FUENTES, | ) |
| JEREMY DEMOND, WILLIAM RASH, | ) |
| ANGELA WALTER, and ILLINOIS | ) |
| DEPARTMENT OF CORRECTIONS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Nolen Chambers, who is incarcerated at Menard Correctional Center, filed the instant lawsuit pursuant to 42 U.S.C. § 1983. He claims Defendants were deliberately indifferent to his serious health needs (Count I), retaliated against him for filing lawsuits against them and requesting medical care (Count II), and failed to adequately accommodate his disabilities (Count III) from August 2012 to the present (Doc. 67).

Now pending before the Court are Defendants John Trost and Fe Fuentes' Motion for Summary Judgment (Doc. 117) and Defendants Kimberly Butler, Jackie Stueve, Jeremy DeMond, William Rash, Angela Walter, and Illinois Department of Corrections' Motion for Summary Judgment (Doc. 133). Plaintiff filed responses in opposition (Docs. 140, 141, 142, and 143) to which Defendants replied (Docs. 157 and 162). For the following reasons, the motions are **GRANTED**.

## Background

The following material facts are either undisputed or taken in a light most favorable to the Plaintiff as the non-moving party: Chambers was transferred to Menard on August 9, 2012 where Dr. Fuentes was the physician until July 15, 2015 and Dr. Trost was the physician from November 2013 to March 2017 (Doc. 141, ¶¶1-3[1]). Prior to his transfer, Chambers had complained about chest pain, dizziness, headaches, shortness of breath, and other ailments (Doc. 141, ¶4) and had undergone various diagnostic tests and treatments, including a Treadmill Stress Echocardiogram and referral to a cardiologist (Doc. 141, ¶ 6).

Chambers complained of recurrent chest pain when he arrived at Menard, and the following interventions occurred:

- Dr. Fuentes conducted a physical examination on February 1, 2013, ordered medications, blood pressure checks, and an EKG (Doc. 141, ¶ 8).

- Dr. Fuentes examined the EKG results, compared them to prior results and noted no changes (Doc. 141, ¶ 9).

- Dr. Trost ordered an EKG on January 14, 2015 and referred Plaintiff to a cardiologist (Doc. 141, ¶ 10).[2]

- Dr. Trost directed Plaintiff be placed on a 23-hour observation when he complained of chest pains on February 8, 2015 (Doc. 141, ¶ 12). At the end of the period, Plaintiff denied having chest pains (Doc. 141, ¶ 13).

- Dr. Trost followed up with Plaintiff on February 11, 2015 for complaints of occasional chest pains and renewed his nitroglycerin prescription for one year, as needed (Doc. 141, ¶ 14).

- On February 26, 2015, Dr. Trost referred Plaintiff for a cardiac catheterization which was subsequently scheduled for March 6, 2015 (Doc. 141, ¶¶ 15, 16).

- The results of the cardiac catheterization revealed 90% stenosis, but a stent was not placed on the date of the catheterization. Dr. Reilly, who performed the

---

[1] Document 141 contains Plaintiff's responses to Defendants Fuentes and Trost's statement of undisputed material facts (Doc. 118).
[2] Plaintiff disputes that this was the first time he saw Dr. Trost but does not support that contention with citation to the record.

catheterization recommended "coronary intervention." (Doc. 143-7, p. 7). On March 18, 2015, medical records state that Dr. Trost indicated "to go out for cath/stent" (Doc. 141-2, p. 108). On the 20th, Plaintiff was referred to a cardiologist, Dr. Satwani, and an appointment was scheduled for April 7, 2015 (Doc. 141-2, p. 109).

- Dr. Satwani noted that Plaintiff could "exercise sometimes at high workloads without having any symptoms" and that his description of symptoms was "not very typical." (Doc. 141, ¶ 21). Dr. Satwani scheduled Plaintiff for a "percutaneous intervention" the next week and prescribed a low dose of metoprolol to be taken along with the aspirin and amlodipine that Plaintiff already was taking (Doc. 141, ¶ 21).

- The next day, April 8, Plaintiff collapsed in his cell and complained of chest pain and he was transported to St. Elizabeth Hospital (Doc. 141, ¶ 22). At the hospital, he underwent another heart catheterization and placement of a drug eluting stent (which contains medication to prevent blood clots).

- Plaintiff was discharged on April 10, 2015 and directed to continue taking aspirin, amlodipine, docusate, and nitroglycerine, and to add Plavix, metoprolol and pravastatin (Doc. 141, ¶ 25).

- Dr. Trost followed up with Plaintiff on April 22, 2015 and he had no complaints, denied chest pain, and was taking his medications (Doc. 141, ¶ 26).

- On June 10, 2015, Plaintiff was seen by Dr. Fuentes (Doc. 141, ¶ 28). The parties dispute what Plaintiff told to Dr. Fuentes and what action Dr. Fuentes took.

- On October 23, 2015, Plaintiff was seen by Dr. Trost (Doc. 141, ¶ 30). The parties dispute what Plaintiff told Dr. Trost and what action Dr. Trost took.

- An x-ray and EKG were ordered on December 23, 2015 (Doc. 141, ¶ 31). The tests revealed no acute pulmonary disease and the EKG results were unchanged from previous results (Doc. 141, ¶¶ 31, 32).

- Plaintiff was seen by Dr. Trost on January 8, January 15, April 18, May 2, May 17, June 23, July 18, and September 19, 2016 for various reasons (Doc. 141, ¶ 33).

- Plaintiff complained of chest pain on January 1, 2017 and was referred to Dr. Satwani by Dr. Trost (Doc. 141, ¶¶ 35, 36).

- Dr. Satwani saw Plaintiff on February 14 and either ordered or recommended a cardiac catheterization (Doc. 141, ¶¶ 37). The test was performed on February 23, 2017 and revealed high grade stenosis (Doc. 141, ¶ 39).

- On February 27, 2017, Plaintiff underwent quadruple coronary artery bypass

surgery (Doc. 141, ¶ 40).  He was discharged from the hospital on March 7, 2017 and remained in the infirmary at Menard until March 13, 2017 (Doc. 141, ¶ 41).  He was seen for a follow up by March 30, 2017 (Doc. 141, ¶ 42).

- On April 8, 2017, Chambers was taken to the emergency room for chest pain and then returned to Menard (Doc. 141, ¶¶ 43, 44).

- Plaintiff was then seen by Dr. Satwani on May 2, 2017 and he indicated the "EKG does not show any acute changes and his enzymes were negative.  I do not believe further ischemia workup is indicated right away" (Doc. 141, ¶ 45).

## Discussion

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue as to any material fact – that is where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986).  If the evidence is merely colorable or is not sufficiently probative, summary judgment should be granted.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986).  Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party.  *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

### Count I – Deliberate Indifference

Prison officials violate the Eighth Amendment if they are deliberately indifferent to a serious medical need.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016).  To prevail on such a claim, an inmate must show that he 1) suffered from an objectively serious medical condition; and 2) that the defendant was deliberately indifferent to a risk of serious harm from that condition. *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016).  An objectively serious condition includes an ailment that has been "diagnosed by a physician as mandating treatment," one that significantly affects an individual's daily activities, or which involves chronic and substantial pain.  *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir.

1997). Here, it is undisputed that Chambers suffered from a serious medical condition. The question is whether there is proof that a defendant knew of but disregarded the risks associated with his condition. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Chambers contends that Dr. Fuentes dismissed his complaints, made insulting comments, failed to order tests, and believed that his complaints "were mental." (Doc. 141-1, ¶ 10). Specifically, he alleges that on May 24, 2014, Dr. Fuentes ignored his complaints of chest pain, high blood pressure, and dizziness, and only gave him pain pills for his back and a cream for a rash (Doc. 141-1, ¶ 25). She denied him necessary medications from May 15 to July 15, 2015 (Doc. 141-1, ¶ 49), refused to address his medical issues on June 10, 2015 and discontinued his blood pressure medication (Doc. 141-1, ¶ 52). He also claims that Dr. Fuentes agreed that catching cardiac blockages early could result in less invasive angioplasty and obviate the need for more invasive surgery like a bypass (Doc. 141-6, p. 6).

Chambers asserts that he mailed letters to Dr. Trost on May 31, 2014 and January 28, 2017 (in addition to 30 prior letters) requesting accommodations for his pain but received no response (Doc. 141-1, ¶¶ 28, 78). When he underwent catheterization in March 2015, he told Dr. Trost that Dr. Reilly indicated his condition was an emergency, but he was not immediately taken back to the hospital to have a stent put in (Doc. 141-1, ¶ 35). Instead of scheduling a stent, Dr. Trost opted to refer him to a cardiologist (Doc. 141-2, p. 109). Later, on October 23, 2015, Chambers again complained of chest pains and numbness but Dr. Trost only addressed a skin rash (Doc. 141-1, ¶ 60; Doc. 141-2, p. 123). On March 13, 2017, 5 days after Chambers returned to Menard following bypass surgery, Dr. Trost sent him back to general population without any accommodations (Doc.

141-1, ⁋ 81).³  Dr. Trost also agreed that an angioplasty with a stent may prevent the necessity of bypass surgery in some cases (Doc. 143-8, p. 7).

There is no evidence that Dr. Trost or Dr. Fuentes were aware of the seriousness of Chambers heart condition until January 2015.  When Dr. Fuentes saw Plaintiff in 2013 for chest pain, she examined him and noted that his EKG results were unchanged.  While Chambers offers a conclusory statement in his affidavit that she dismissed his complaints from 2012 to 2015, to defeat summary judgment, a plaintiff produce specific evidence – vague, unsupported statements are not enough.

In any event, there is no evidence that Dr. Fuentes or Dr. Trost provided less than minimally competent care.  S*ain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'" (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998))).  Rather, the record indicates that they both provided significant medical care including examinations, medications, referral to a specialist, and surgery based on those specialist's recommendations.  While Chambers may have wanted different treatment, he is not entitled to specific medical care or even the best care possible; he is only "entitled to reasonable measures to meet a substantial risk of serious harm." *Forbes v. Edgar*, 112 F.2d 262, 267 (7th Cir. 1997).

While non-medical defendants may rely on the medical judgment of medical personnel. G*reeno,* 414 F.3d at 655-656 (quoting with approval *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004)), they "cannot simply ignore an inmate's plight." *Arnett v. Webster*, 658 F.3d 742, 755 (7th

---

³ In his testimony, Dr. Trost did not recall in what manner Plaintiff returned to his general population cell after bypass surgery (Doc. 143-8, pp. 31-32).  However, he testified that inmates returning from surgery would commonly require pain medication and various accommodations like a medical lay-in tray and low bunk (Doc. 143-8, p. 31-32).

Cir. 2011); *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016). Thus, if a plaintiff's communication to them "in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety,'" he can be found to be deliberately indifferent to Plaintiff's serious needs. *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 837). Here, with respect to the remaining Defendants, the record shows that they relied on the determinations of medical staff. Further, there is no evidence that they were aware of Chambers' medical needs.

For these reasons, Defendants are entitled to summary judgment on Count I.

### Count II - Retaliation

An inmate plaintiff has a First Amendment right to file grievances and lawsuits. *Id.; Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010). And "[a]n act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). In order to prevail on his First Amendment retaliation claim, Chambers must prove that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014) (citations omitted). If he establishes these elements, the burden shifts to Defendants to show that the harm would have occurred anyway. *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

Chambers merely alleges in conclusory fashion that correctional officers DeMond, Rash, and Stueve took retaliatory actions against him because of his lawsuit, letters, grievances, complaints, and other requests. However, he has failed to proffer evidence of unconstitutional motive – without which, summary judgment cannot be defeated.

### Count III – Failure to Accommodate Disability

To succeed on a failure to accommodate claim under Section 504 of the Rehabilitation Act, a plaintiff must establish that (1) he is a qualified individual; (2) with a disability; (3) was denied the "benefits of the services programs, or activities of a public entity" or was subjected to discrimination by the entity; and (4) denial or discrimination was because of his disability. *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). "Refusing to make reasonable accommodations is tantamount to denying access; although the Rehabilitation Act does not expressly require accommodation, 'the Supreme Court has located a duty to accommodate in the statute generally.'" *Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 672 (7th Cir. 2012).

Chambers alleges he is disabled because his "heart condition, quadruple bypass surgery, and pain have and continue to substantially limit [his] ability to enjoy basic life activities such as walking far distances and breathing" (Doc. 67, ¶ 71) and claims the Illinois Department of Corrections denied him: (1) kosher meals; (2) his prescribed medications; (3) medical passes; (4) a breathing exercise machine; (5) a pillow; and (6) a low bunk (Doc. 67, ¶¶ 15–17, 21, 28-30, 39, 43–46, 49, 53, 54, 62, 65, 69, 72, 75, & 76).

"[N]on-chronic impairments" with "little or no long term or permanent impact" are not disabilities. *See Howell v. Butler*, 2019 WL 1864853, *13 (S.D. Ill. Apr. 25, 2019). Although Chambers was recovering from surgery and unable to breathe properly or walk for distances for a time, there is no evidence that his recovery-related ailments were permanent or were beyond what is normally expected. Thus, he is not disabled under the Act. Moreover, even if the Court found that Chambers was disabled and denied services, he offers no evidence that the alleged denial or discrimination was because of his disability. Therefore, Defendants are also entitled to summary judgment with respect to this claim.

## Conclusion

For the foregoing reasons, Defendants' Motions for Summary Judgment (Docs. 117 and 133) are **GRANTED**.  The Clerk of Court is **DIRECTED** to enter judgment accordingly and to close this case.

**IT IS SO ORDERED.**

**DATED: September 27, 2021**

*Staci M. Yandle*

**STACI M. YANDLE**
**United States District Judge**